UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LLOYD F. AUDETTE,                              *
                                               *
          Plaintiff,                           *
                                               *
     v.                                        *
                                               *
ADRIANA CARRILLO, M.D.; CHARLES                *
DICECCA, M.D.; MASSACHUSETTS                   *     Civil Action No. 15-cv-13280-ADB
PARTNERSHIP FOR CORRECTIONAL                   *
HEALTHCARE, LLC; MARIE ANGELES,                *
M.D.; SUPERINTENDENT KELLY RYAN,               *
                                               *
          Defendants.                          *
                                               *

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

          This case concerns the quality of the medical care that Plaintiff Lloyd Audette received

while incarcerated at the Massachusetts correctional institutions in West Concord and Shirley

("MCI Concord" and "MCI Shirley," respectively).  Plaintiff claims that Defendants were

deliberately indifferent to his serious medical needs, that when he complained of mistreatment,

medical treatment was withheld, and that the care he eventually received was negligently

provided.  Before the Court are two motions for summary judgment—one filed by Defendant

Adriana Carrillo, M.D., [ECF No. 167], and the other filed by Defendant Maria Angeles, M.D.,

[ECF No. 173].  For the reasons explained below, Dr. Angeles's motion is GRANTED, and Dr.

Carrillo's motion is GRANTED in part and DENIED in part.

## I.  PROCEDURAL HISTORY

          Plaintiff's First Amended Complaint [ECF No. 16] asserted claims against eleven

defendants, including (1) claims under 42 U.S.C. § 1983 for violation of rights guaranteed by the

First, Eighth, and Fourteenth Amendments to the United States Constitution, and conspiracy to violate those rights through deliberate indifference as against Dr. Carrillo, Dr. Angeles, and others (Count I) and retaliation as against all Defendants (Count II), (2) violations of the Massachusetts Declaration of Rights and civil conspiracy as against Dr. Carrillo, Dr. Angeles, and others (Count III), (3) negligence as against Dr. Angeles and UMass Correctional Health (Count IV);  and (4) negligence as against Dr. Carrillo and others (Count V), and (5) negligent infliction of emotional distress as against Dr. Carrillo and others (Count VI).

Dr. Carrillo and Dr. DiCecca answered the Complaint [ECF Nos. 24, 37], while the remaining Defendants, including Dr. Angeles, moved to dismiss.  [ECF Nos. 42, 55, 57, 62]. Two defendants had all claims against them dismissed by the Court [ECF No. 72],[1] and five additional defendants were dismissed by stipulation.[2]

The Court dismissed Plaintiff's negligence and conspiracy claims against Dr. Angeles, but denied her motion to dismiss the non-conspiracy portions of Counts I, II, and III, leaving the claims for violations of federal and state constitutional rights pending against Dr. Angeles.  [ECF No. 72 at 16].  Counts I, II, III, V, and VI—violations of constitutional rights, negligence, and negligent infliction of emotional distress—remain pending against both Dr. Carrillo and Dr. DiCecca.  Dr. DiCecca has not filed a motion for summary judgment.

_____

[1] All claims against Superintendent of MCI Shirley Kelly Ryan and UMass Correctional Health Care were dismissed by the Court.  [ECF No. 72].

[2] In ruling on the motions to dismiss, the Court dismissed some of the claims against physician assistant Andrea Tortolano and physical therapist Steven Robins, and limited the claims against the Commissioner of the Massachusetts Department of Correction, the Superintendent of MCI Concord, and the Commissions of the Massachusetts Department of Public Health to conduct done in their official capacities.  [ECF No. 72].  All these defendants were subsequently dismissed by stipulation.  [ECF No. 134, 149, 154].

## II.  FACTUAL BACKGROUND

As required by the applicable legal standard on a motion for summary judgment, the following factual summary draws all reasonable inferences in favor of Plaintiff as the non-movant.

After being convicted of armed robbery in October 2009, Plaintiff began a period of incarceration at MCI facilities that lasted until May 2017.  [ECF No. 181 ¶ 22].  Plaintiff contends that when he arrived at MCI Shirley in 2009, Dr. Angeles, who supervised Plaintiff's medical care there, told him "you will not receive any medical treatment because you like to file grievances."  [ECF No. 184 ¶¶ 3, 6].  Plaintiff suffered from a degenerative joint disease and had received oxycodone for pain management during a prior period of incarceration, but Dr. Angeles discontinued that prescription.  [ECF No. 184 ¶¶ 9–10].  Dr. Angeles provided Plaintiff with limited treatment in 2010 and 2011 but neglected to provide pain medication stronger than over-the-counter, nonsteroidal anti-inflammatory agents and refused to see Plaintiff for several weeks in September 2010.  [ECF No. 181 ¶¶ 5, 7; ECF No. 183-2 at 47:3–10].  In October 2011, a nurse practitioner at MCI Shirley recommended that Plaintiff receive a total left knee replacement [ECF No. 181 ¶ 8].

The Department of Correction contracts third parties to provide health services to inmates, and Lemuel Shattuck Hospital ("Shattuck") is the primary referral hospital for patients in need of off-site surgeries.  [ECF No. 179-6 at 137–138].  Shattuck in turn contracts with medical groups to meet its need for physicians.  Pursuant to such a contractual arrangement, Dr. Carrillo as an employee of Orthopedic Trauma, P.C., provided care to Plaintiff, as well as to members of the general public, at Shattuck.  [ECF No. 180 ¶¶ 5–6].

On March 29, 2012, Plaintiff saw Dr. Carrillo for the first time for a consultation. After X-rays revealed osteoarthritis in Plaintiff's left knee, Dr. Carrillo explained that a knee replacement would be the next step. [ECF No. 180 ¶¶ 8, 9]. She further explained to Plaintiff that the waiting period for the surgery would be six months to a year and gave Plaintiff a cortisone injection in his left knee in the meantime. [ECF No. 180 ¶ 10]. Shattuck planned to schedule Plaintiff's knee replacement as soon as it was approved by the Department of Correction. [ECF No. 180 ¶ 11].

At MCI Shirley, the committee responsible for reviewing inmates' medical treatment options denied Plaintiff's request for a knee replacement ostensibly because Dr. Angeles failed to properly fill out the required paperwork. [ECF No. 181 ¶ 9]. Plaintiff learned that his request had been denied in the summer of 2012 due to the incomplete paperwork. He spoke with state officials who had the paperwork resubmitted and his knee replacement was then approved. [ECF No. 184 ¶¶ 22–25].

On August 14, 2012 Shattuck scheduled Plaintiff for a total knee replacement. [ECF No. 184 ¶ 26]. He was admitted for the procedure on December 18, 2012, and Dr. DiCecca performed the knee replacement on December 19, 2012, with assistance from Dr. Carrillo, whose role was limited to holding a retractor. [ECF No. 180 ¶¶ 12–16]. During the procedure, a branch of Plaintiff's popliteal vein was cut. [ECF No. 180 ¶ 17]. Dr. DiCecca and Dr. Carrillo consulted with a general surgeon at Shattuck, who did not find evidence of acute bleeding or an interruption to the venous or arterial system but recommended that Plaintiff be placed on either Coumadin or subcutaneous Heparin following the procedure. [ECF No. 180 ¶¶ 18–20]. Checks of Plaintiff's International Normalized Ratio ("INR") levels were ordered for the seven days following his knee replacement to ensure that the correct dose of Coumadin was being

administered.  [ECF No. 180 ¶ 21].  In violation of both Shattuck policy and the standard of care,

Plaintiff's INR levels were not checked during the first four days following his surgery and

Coumadin was administered in incorrect doses.  [ECF No. 180 ¶¶ 22–23].  As a result, Plaintiff

had internal bleeding which resulted in a hematoma in Plaintiff's left leg and pain that left him

unable to sleep.  [ECF No. 180 ¶¶ 19, 24, No. 181 ¶ 15].  Plaintiff remained hospitalized until

January 8, 2013, when he was transferred back to an MCI facility.  [ECF No. 180 ¶ 25].

At some point after the December 18 surgery, Plaintiff developed laxity of his left knee,

which necessitated revision surgery.  [ECF No. 180 ¶ 28].  Dr. DiCecca performed the revision

surgery on March 12, 2013 without assistance from Dr. Carrillo.  [ECF No. 180 ¶¶ 29, 30].

Despite the revision surgery, Plaintiff continued to experience joint pain and instability in his left

knee.

He saw Dr. Carrillo again on April 11, 2013, [ECF No. 179-4 ¶ 42], and claims that

during that visit Dr. Carrillo told him, "You're not getting a third surgery, your knee can just stay

the way it is."  [ECF No. 181 ¶ 19].  At some point, Plaintiff threated Dr. Carrillo with a

lawsuit.[3]  [ECF No. 180 ¶¶ 31-32].  Dr. Carrillo's professional opinion was that Plaintiff was

"never going to be happy with whatever we did," but she nevertheless referred him to Dr.

DiCecca, who met with Plaintiff on May 22, 2013 and advised him to "live with the situation as

it is."  [ECF No. 179-4 ¶¶ 42–43, No. 179-5 at 119:16–19].

---

[3] The date on which Plaintiff first threatened to file a lawsuit against Dr. Carrillo is not entirely clear from the record.  Dr. Carrillo's Statement of Undisputed Material Facts suggests that she was facing the threat of a lawsuit when she referred Plaintiff to Dr. DiCecca in early 2013, and Plaintiff has not specified an alternative time line with any specificity.  It is undisputed that Plaintiff made several grievances between 2013 and 2015, [ECF No. 179-2], filed a medical malpractice action against Dr. DiCecca and Dr. Carrillo on July 14, 2014, [ECF No. 16 ¶ 51], and filed this action on September 2, 2015.

Plaintiff next consulted with a nurse practitioner at MCI Concord, who noted on July 17, 2013 that his "knee [was] still very unstable with severe laxity and crepitus." [ECF No. 179-3 at 97–105]. On November 7, 2013 and January 22, 2014, Plaintiff met again with Dr. DiCecca, who noted that it was not entirely clear what was causing his continued pain but told him not to pursue additional treatment. [ECF No. 179-4 ¶¶ 45–46].

On June 12, 2015, Plaintiff was again examined by staff at Shattuck who told him that he needed an additional knee surgery but that that would require approval from Dr. Carrillo. This surgery was never arranged. [ECF No. 181 ¶ 21]. Plaintiff claims that the Shattuck staff met with Dr. Carrillo after he left and then reversed their view that he needed an additional surgery. [ECF No. 181 ¶ 21]. In response, Plaintiff filed a formal grievance and a lawsuit. [ECF No. 179-2 at 2].

On May 15, 2017 just days after his eventual release from custody, Plaintiff was treated at Tufts Medical Center, where the doctors determined that his left knee replacement had "failed." [ECF No. 179-4 ¶ 49]. On June 1, 2017, Plaintiff was scheduled for total hip and knee replacement surgeries, which were justified based on "severe pain associated with [the] activities of daily living." [ECF No. 179-4 ¶ 49].

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider the facts of record and draw "all reasonable inferences therefrom in the light most favorable to the nonmoving party." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183–84 (1st Cir.1999)). The Court will not, however, "draw unreasonable

inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014) (citation omitted). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party," and a "fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Borges, 605 F.3d at 4–5. The substantive law determines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id.

"The moving party bears the initial burden of informing the trial court of the basis for his motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." Borges, 605 F.3d at 5 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Once the moving party has accomplished this feat, the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5.

## IV. DISCUSSION

### A. Dr. Angeles

Plaintiff has pending claims against Dr. Angeles for violations of his federal and state constitutional rights pursuant to 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12 § 11I. Dr. Angeles makes two arguments for summary judgement: (1) that Plaintiff's claims are barred by the three-year statute of limitations, and (2) that Plaintiff has failed to produce evidence of

deliberate indifference or retaliation. [ECF No. 174 at 1]. The Court agrees with the first argument and does not reach the second.

"Section 1983 does not contain a built-in statute of limitations. Thus, a federal court called upon to adjudicate a section 1983 claim ordinarily must borrow the forum state's limitation period governing personal injury causes of action." Nieves v. McSweeney, 241 F.3d 46, 51 (1st Cir. 2001). Massachusetts prescribes a three-year statute of limitations for personal injury claims, and federal courts have borrowed the three-year period for § 1983 claims arising in the Commonwealth. See id. "Both federal and Massachusetts law agree that a § 1983 claim accrues when a plaintiff knows or has reason to know of his injury." Poy v. Boutselis, 352 F.3d 479, 483 (1st Cir. 2003) (citing Nieves, 241 F.3d at 52; Riley v. Presnell, 565 N.E.2d 780, 784 (Mass. 1991)). Plaintiff knew of every fact relied upon in his Complaint against Dr. Angeles as of August 14, 2012—the date on which his knee replacement surgery was scheduled—and did not file his Complaint until September 2, 2015. Plaintiff does not dispute that his claims are subject to a three-year statute of limitations, but claims that Dr. Angeles's medical care constitutes a continuing course of unlawful conduct that extended into the limitations period. [ECF No. 183 at 7–10].

"The classic example of a continuing violation is a hostile work environment," Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009), but the doctrine has been applied to § 1983 claims as well, e.g. Clark v. Clarke, No. 11-11490-RWZ, 2013 WL 1144901, at *8 (D. Mass. Mar. 18, 2013). "Under the 'continuing violation' doctrine, a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period." Tobin, 553 F.3d at 130. It is "well established that the doctrine does not apply to 'discrete acts' of alleged discrimination that occur on a 'particular day,' but

only to discriminatory conduct that takes place 'over a series of days or perhaps years.'"  Id. (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002)).

Plaintiff alleges a continuing violation by Dr. Angeles based on eight acts between 2009 and the summer of 2012 all of which involve Dr. Angeles informing Plaintiff that he would not receive care, or her withholding care or providing care only after Plaintiff filed grievances.  [ECF No. 183 at 4].[4]  In evaluating alleged continuing violations, courts consider whether the separate acts constituted the same type of conduct, recurred frequently, and had a degree of permanence triggering plaintiff's duty to assert his rights.  Clark, 2013 WL 1144901, at *8 (citing Schonarth v. Robinson, No. 06–CV–151–JM, 2008 WL 510193, at *6 (D.N.H. Feb. 22, 2008); see also Foster v. Morris, 208 F. App'x 174, 178 (3d Cir. 2006)).

Here, the continuing violation doctrine is inapplicable because Plaintiff alleges no action taken by Dr. Angeles in the three years prior to Plaintiff filing his complaint.  See Tobin, 553 F.3d at 130 (requiring that "a related act fell within the limitations period."); see also O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) ("The continuing violation doctrine is an equitable exception that allows . . . damages for otherwise time-barred allegations if they are deemed part of an ongoing series of . . . acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'" (quoting Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir. 1998), partially abrogated by Crowley v. L.L. Bean, Inc., 303 F.3d 387 (1st

---

[4] Plaintiff alleges that between 2009 and the summer of 2012, Dr. Angeles (1) informed Plaintiff that she intended to withhold necessary medical treatment because Plaintiff filed grievances, (2) refused to provide pain medications which Plaintiff had received during his prior incarceration, (3) waited four weeks to see Plaintiff when he was "in pain all the time," (4) again refused to see Plaintiff leaving him in a state which he described as "torture," (5) refused to provide a medically necessary orthopedic consult, (6) refused to order a medically necessary MRI, (7) forced Plaintiff to file a grievance against Dr. Angeles to obtain a knee replacement, and (8) filed an incomplete request for Plaintiff's knee surgery.

Cir. 2002))); <u>Mack v. Great Atl. & Pac. Tea Co.</u>, 871 F.2d 179, 183 (1st Cir. 1989) (inability to point to an instance of discrimination within the statute of limitations period "devastates" continuing violation argument).

Additionally, assuming Plaintiff's allegations are true, some of the instances in which Dr. Angeles denied Plaintiff medical care constituted stand-alone violations of Plaintiff's constitutional rights sufficient to put him on notice that his rights were being violated – in other words, the conduct did not need to be repetitive or considered collectively for the violation to become apparent. <u>Compare</u> <u>Clark</u>, 2013 WL 1144901, at *8 (finding continuing violation based on shackling an inmate at all times that he was outside his cell, including while alone in an exercise cage, every day for more than five years) <u>with</u> <u>Foster v. Morris</u>, 208 F. App'x 174 (3d Cir. 2006) (finding continuing violation doctrine inapplicable to a prison's lack of handicapped accessible facilities, because the plaintiff was on notice of the violation each time he was transferred to the prison at issue); <u>contra</u> <u>Reaves v. Dep't of Corr.</u>, 333 F. Supp. 3d 18 n. 3 (D. Mass. 2018) (finding continuing violation doctrine applicable where quadriplegic and hearing impaired inmate was allegedly denied adequate medical care and accommodations). As an example, unlike the daily shackling in <u>Clark</u>, which amounted to a violation of that plaintiff's rights only when considered cumulatively, telling Plaintiff that he would not receive medical care due to his propensity to file grievances and refusing to prescribe him medication at that time would not require frequent recurrence to amount to a violation of rights or to put Plaintiff on notice of that violation.

**B. Dr. Carrillo**

Dr. Carrillo claims that she did not act under the color of state law as required for Counts I, II, and III, and that plaintiff cannot otherwise make out a case for deliberate indifference, retaliation, conspiracy, or negligence.  [ECF No. 169].

### i.  Under Color of State Law

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  In the context of medical services for inmates, the Supreme Court held in West that a doctor who served inmates within North Carolina's correctional system pursuant to a contract that did not grant him the same employment benefits as other state employees nevertheless acted under the color of state law, because "it is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State."  Id. at 55–56.  The circuit courts have applied the principles of West to find that doctors who did not contract directly with a prison system nevertheless acted under color of state law, because "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."  Id. at 56; see Carl v. Muskegon Cty., 763 F.3d 592, 596 (6th Cir. 2014) (A state "may not escape § 1983 liability by contracting out or delegating its obligation to provide medical care to inmates." (citations omitted)).  Additionally, district courts have found that doctors acted under the color of state law even where they had no contractual relationship with the state.  E.g. Conner v. Donnelly, 42 F.3d

220, 225 (4th Cir. 1994) (holding private doctor who treated detainee but had no contractual

relationship with the prison was still a state actor because "[r]egardless of whether the private

physician has a contractual duty or simply treats a prisoner without a formal arrangement with

the prison, the physician's function within the state system is the same."); Anglin v. City of

Aspen, 552 F. Supp. 2d 1229 (D. Colo. 2008) (finding that a doctor who had no direct

contractual relationship with the state or contact with law enforcement during the incident in

question acted under color of state law when he issued an order over the phone to administer a

sedative to a detainee).

Medical service providers may avoid the umbrella of state action when they are asked to

treat inmates by refusing to provide medical services, or where they are obligated by law to

provide treatment, if they are not a part of the state's standard system for providing medical care

to inmates.  See Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 831 (7th Cir. 2009)

(finding that refusal to care for inmate did not constitute state action); Sykes v. McPhillips, 412

F. Supp. 2d 197, 204 (N.D.N.Y. 2006) (finding no state action based upon a single encounter

with a prisoner who presented for emergency treatment that the doctor was obligated by law to

provide).

Dr. Carrillo argues that because she did not personally contract with the Commonwealth

or Shattuck, she did not act under the color of state law by providing care to inmates as part of

her duties at Shattuck.  The facts of this case demonstrate, however, that Dr. Carrillo provided

Plaintiff with medical care as part of the state's standard system for providing medical care to

inmates.  At the time Plaintiff was treated, Shattuck was the primarily referral hospital for the

Massachusetts Department of Correction.  [ECF No. 179-6 at 137–138].  The Department of

Correction required inmates to be referred to Shattuck if a hospital visit was required and

Shattuck was able to provide the care. [ECF No. 179-1 at 68–69]. Because an inmate doesn't have any options with regards to where he is treated, when Plaintiff was dissatisfied with the treatment he received at Shattuck and asked to "go elsewhere and have it [his knee] seen," his requests was denied. [ECF No. 179-3 at 13–14]. Dr. Carrillo does not dispute that Plaintiff had no choice—other than refusing necessary medical care—but to accept Dr. Carrillo's care. For those reasons, Dr. Carrillo operated under the color of state law when she provided care to Plaintiff.

### ii. Deliberate Indifference in Violation of Constitutional Rights (Count I)

"Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment. The Eighth Amendment is meant to prohibit 'unnecessary and wanton infliction of pain,' which is 'repugnant to the conscience of mankind.'" Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)). "[N]ot all shortages or failures in care exhibit the intent and harmfulness required to fall within" the ambit of the 8th Amendment however. Id.; see Rosen v. Chang, 811 F. Supp. 754, 758 (D.R.I. 1993) ("Inadvertent failures to provide medical care or ordinary medical malpractice are not enough to show 'deliberate indifference.'"). "[A]n inmate has no right to the treatment of his choice, as long as the treatment that he does receive is adequate." Hennessy v. Dennehy, No. 08CV11724-NG, 2010 WL 3464234, at *8 (D. Mass. Sept. 1, 2010). "[T]o prove an Eighth Amendment violation, a prisoner must satisfy . . . two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of . . . deliberate indifference to that need." Kosilek, 774 F.3d at 82. To put it differently, Plaintiff must offer evidence capable of proving that he had a serious medical need that was inadequately treated because of Dr. Carillo's deliberate indifference to his situation. Hennessy, 2010 WL 3464234, at *8. The subjective prong requires evidence that Dr. Carrillo

knew of and disregarded an excessive risk to Plaintiff's health. This is evidence beyond "mere negligence," although the standard can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835–37 (1994).

Dr. Carrillo does not contest that Plaintiff's condition amounted to a serious medical need. Instead, she claims that Plaintiff cannot offer sufficient evidence to support a claim of deliberate indifference where Dr. Carrillo fully examined Plaintiff during his initial consult in March 2012, recommended the knee replacement, and then provided appropriate post-operative care. Dr. Carrillo acknowledges that Plaintiff's expert criticizes the failure to check Plaintiff's INR levels during his first four post operation days, but notes that she identified the issue and then immediately rectified it. Plaintiff does not quarrel with these assertions, but rather claims that it was Dr. Carrillo's conduct after his March 23, 2013 revision surgery that gives rise to his deliberate indifference claim.

Following the March 2013 revision surgery, Plaintiff experienced joint pain and instability. Plaintiff had a consultation with Dr. Carrillo in April 2013, where he claims that Dr. Carrillo told him, "You're not getting a third surgery, your knee can just stay the way it is." [ECF No. 181 ¶ 19]. Dr. Carrillo testified at her deposition that, in her medical opinion, Plaintiff's knee condition shortly after the knee revision surgery was "really good," and that despite her view that Plaintiff was "never going to be happy with whatever we did," she referred Plaintiff to Dr. DiCecca who became the decision maker with regard to further treatment. [ECF No. 179-5 at 119]. Because Dr. Carrillo exercised reasonable medical judgement in referring Plaintiff to Dr. DiCecca in April 2013, Dr. Carrillo's actions in April 2013 cannot reasonably support a claim for deliberate indifference. Dr. Carrillo provided all, if not more than, the the

law required by referring Plaintiff to a surgeon who could evaluate whether additional surgery was appropriate.

Given the treatment Dr. Carrillo provided in April 2013, Plaintiff's argument that she acted to deny him care after his revision surgery rests squarely on his attestation that on June 12, 2015 medical staff at Shattuck told him that he needed a surgery that would have to be approved by Dr. Carrillo and then subsequently reversed their position. Even if the Court assumed that Dr. Carrillo played some role in a decision not to provide Plaintiff a surgery in June 2015, Plaintiff has offered no evidence from which a jury could reasonably infer that Dr. Carrillo was subjectively indifferent to Plaintiff's needs at that time. Plaintiff has not offered any evidence beyond his own affidavit from which a trier of fact could conclude that Dr. Carrillo's actions in June 2015 amounted even to malpractice, much less to an 8th Amendment violation. Therefore, Dr. Carrillo's motion for summary judgment on Count I will be granted.

### iii.   Retaliation in Violation of Constitutional Rights (Count II)

To survive summary judgment on a retaliation claim, Plaintiff must demonstrate (1) that he engaged in protected activity, (2) that prison officials took an adverse action against him, and (3) that there is a causal link between the protected activity and the adverse action. Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "Because prisoner retaliation claims are 'easily fabricated[] and . . . pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration,' courts must insist that such claims are bound up in facts, not in the gossamer strands of speculation and surmise." Id. (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)). It is "incumbent upon plaintiff to 'furnish a factual basis to support a reasonable inference of a retaliatory animus.'" Lopes v. Riendeau, 177 F. Supp. 3d 634, 661 (D. Mass. 2016) (quoting Hannon, 645 F.3d at 50). When a defendant presents "a legitimate reason for the action and the plaintiff provides no evidence to dispute it, a court will not 'speculate

about a hidden motive' at the summary judgment stage." Lopes v. Riendeau, No. 14–10679–NMG, 2017 WL 1098812, at *8 (D. Mass. Mar. 23, 2017) (quoting Hannon, 645 F.3d at 51). A reasonable inference of retaliatory conduct may, however, be supported by "[c]ircumstantial evidence, like the timing of events." Thaddeus-X v. Blatter, 175 F.3d 378, 399 (6th Cir. 1999). "[T]emporal proximity between the protected activity and the allegedly retaliatory act can itself be sufficient circumstantial evidence of causation." Mattei v. Dunbar, 217 F. Supp. 3d 367, 377 (D. Mass. 2016).

Here, there is no dispute that Plaintiff engaged in protected activities. See Hannon, 645 F.3d at 48 ("[I]n filing his own grievances and legal actions, [plaintiff was] plainly engaged in protected activity."). Plaintiff has not, however, shown how a causal link could reasonably be drawn between his protected acts and Dr. Carrillo's denial of medical care. Plaintiff suggests three possible actions that could have caused Dr. Carrillo to retaliate against him, none of which supports an inference of retaliation by Dr. Carrillo. See [ECF No. 179 at 17].

First, Plaintiff says he threatened to sue Dr. Carrillo and then filed a lawsuit in 2014. [ECF No. 181 ¶¶ 18, 20]. Dr. Carrillo asserts that she was aware of Plaintiff's threat when she referred Plaintiff to Dr. DiCecca in April 2013, and Plaintiff has not offered a specific alternative timeline. [ECF No. 179 at 16–17 No. 180 ¶¶ 31, 32; No 181 ¶ 19]. The evidence indicates that, roughly a month after his revision surgery, when Dr. Carrillo told Plaintiff that his knee could "stay the way it is," that reflected her professional opinion that Plaintiff was recovering well. Nonetheless, in the face of Plaintiff's threat and out of an abundance of caution, Dr. Carrillo referred Plaintiff to his surgeon, Dr. DiCecca, for further evaluation. Plaintiff seems to suggest that the retaliation for the threat to sue in 2013 came in 2015 when Dr. Carrillo allegedly denied him a further revision surgery. [ECF No. 179 at 18]. There is simply no evidence, plausible or

otherwise, to support the claim that Dr. Carrillo referred Plaintiff for additional evaluative treatment immediately after Plaintiff threatened a lawsuit in 2013, took no further action against Plaintiff for more than two years, and then intervened to deny Plaintiff medical care in June 2015 in retaliation for the 2013 threat.[5]

Second, Plaintiff points to general complaints about his treatment that he made to personnel at MCI Concord that could support his claim for retaliation, but it is unclear when these complaints were made or whether Dr. Carrillo ever became aware of them. [ECF No. 179 at 18].

Third, Plaintiff points to Grievance No. 82345, which he filed on July 28, 2015, several weeks _after_ the June 2015 incident in which Dr. Carrillo allegedly refused to approve a surgery for Plaintiff. [ECF No. 179-2 at 2]. It is not plausible that a grievance filed after the medical decision could support the idea of the medical decision being retaliation for the not yet filed grievance, nor is there any evidence that Dr. Carrillo knew that the grievance was going to be filed at the time she made any decision about the additional surgery.

Because there is no evidence of retaliation, Dr. Carrillo's motion for summary judgment on Count II will be granted.

### iv. Conspiracy (Counts I, II, III)

Plaintiff claims that Dr. Carrillo and others conspired to violate his civil rights under both the federal and state constitutions. Under federal law, "[a] civil rights conspiracy . . . is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a

---

[5] Although Plaintiff filed a lawsuit against Dr. Carrillo in July 2014, [ECF No. 16 ¶ 51], that lawsuit was dismissed without prejudice, and Plaintiff has proffered no evidence to show that Dr. Carrillo learned of the lawsuit or reacted negatively to it. See [ECF No. 179 at 17] (citing only to Plaintiff's affidavit to support a connection between the lawsuit Plaintiff filed in 2014 and the denial of care in 2015).

lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'" Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988) (quoting Hampton v. Hanrahan, 600 F.2d 600, 620–21 (7th Cir.1979)). "A plaintiff has to prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right." Nieves, 241 F.3d at 53; accord Torres–Rosado v. Rotger–Sabat, 335 F.3d 1, 14 (1st Cir. 2003). To survive summary judgment, a Plaintiff must show that there is "a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding to achieve the conspiracy's objectives." Pelenty v. City of Seal Beach, 588 F. App'x 623, 624 (9th Cir. 2014) (quoting Mendocino Envtl. Ctr. v. Mendocino Cty., 192 F.3d 1283, 1301 (9th Cir. 1999)).

The same is true under Massachusetts law, which recognizes both coercive conspiracies and tort-based joint-action conspiracies. A coercive conspiracy requires the plaintiff to establish "that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently," while a conspiracy premised upon joint liability in tort may be invoked "to support liability of one person for a tort committed by another." MacFarlane v. Town of E. Bridgewater, 110 F. Supp. 3d 310, 329 (D. Mass. 2015) (quoting Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994)). To support a claim for common law conspiracy, a plaintiff must offer facts that suggest the existence of an agreement or common plan between two or more persons. See Soni v. Bos. Med. Ctr. Corp., 683 F. Supp. 2d 74, 100 (D. Mass. 2009).

The Court granted Dr. Angeles's motion to dismiss the conspiracy claim against her because Plaintiff had not adequately alleged an agreement between Dr. Angeles and any other

provider.  Similarly, Plaintiff has not offered evidence from which a jury could find that Dr.

Carrillo entered into an agreement to deprive Plaintiff of his rights.  Plaintiff argues that a jury

could infer Dr. Carrillo's participation in a conspiracy to deny him constitutionally required

medical care.  His argument seems to be that (1) in 2013 Dr. Carrillo told him that his "knee can

stay just the way it is;" (2) in 2015, she denied his request for further treatment; (3) between

2013 and 2015, Plaintiff had a history of making complaints, had severe medical problems, and

those medical problems went undertreated for lengthy periods due to the actions of Dr. Angeles

and others; (4) given Dr. Carrillo's involvement in 2013 and 2015 and the number of other

players in between, a jury could infer that Dr. Carrillo and the others participated in a

longstanding conspiracy.

As discussed above, the timeline Plaintiff has proffered makes any inference that Dr.

Carrillo entered into a conspiracy to violate his rights implausible.  Dr. Carrillo provided

adequate medical care to Plaintiff in April 2013 and there is no evidence, other than Plaintiff's

attestation, that Dr. Carrillo participated in the decision to deny him care in 2015.  Even

assuming Dr. Carrillo was involved in the June 2015 decision not to provide Plaintiff a third

surgery, there is no evidence that Dr. Carrillo entered into an agreement to violate Plaintiff's

rights.  Plaintiff's allegations, standing along, are insufficient to support his conspiracy claims.

See Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (affirming summary

judgment on § 1983 conspiracy claim where a reasonable jury could not have inferred a

conspiracy to inflict harm on plaintiff), partially abrogated on other grounds by Maldonado v.

Fontanes, 568 F.3d 263 (1st Cir.2009); Spencer v. City of Boston, No. 13-11528-MBB, 2015

WL 6870044, at *10 (D. Mass. Nov. 6, 2015) (granting summary judgment on claim of

conspiracy in violation of § 1983 that was supported only by Plaintiff's deposition testimony).

Plaintiff's conspiracy claims amount to speculation that because he complained about his medical care and then received inadequate care from several individuals, those individuals must have agreed to violate his constitutional rights. Therefore, Dr. Carrillo's motion for summary judgment will be granted as to Counts I, II, and III.[6]

**Negligence and Negligent Infliction of Emotional Distress (Counts V and VI)**

Under Massachusetts law, for a negligence claim, a plaintiff in a medical malpractice suit must show: (1) a physician-patient relationship existed between the physician and the plaintiff, (2) the physician breached his or her duty of care, and (3) the breach was the proximate cause of the injury. Mitchell v. United States, 141 F.3d 8, 13 (1st Cir. 1998) (citing Blood v. Lea, 530 N.E.2d 344, 347 (Mass. 1988); Poyser v. United States, 602 F. Supp. 436, 438 (D. Mass. 1984); Berardi v. Menicks, 164 N.E.2d 544, 546 (Mass. 1960)). To recover for negligent infliction of emotional distress, a plaintiff must show (1) negligence, (2) emotional distress, (3) causation, (4) physical harm manifested by objective symptomatology, and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case. Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982).

Here, Plaintiff received Coumadin in the days following his surgery. Plaintiff has offered an expert report by Dr. Patrick Hlubik that asserts:

> When anticoagulating a patient with Coumadin, standard of care requires the physician (and/or physician assistant) to monitor and adjust the Coumadin levels, not only to achieve therapeutic anticoagulation (*i.e.*, an INR within therapeutic range), but to prevent or limit morbidity and mortality . . . . In this case, the patient [Plaintiff] received Coumadin without having his INR followed correctly, which was a deviation from both hospital policy and standard of care, and resulted in a

---

[6] Counts I, II, and III each assert violations of specific constitutional rights and "Civil Conspiracy." For the reasons explained supra, Dr. Carrillo's motion for summary judgment on Counts I, II, and III is granted because Plaintiff has not offered sufficient evidence to support his claims that Dr. Carrillo violated his state and federal constitutional rights either individually or through participation in a conspiracy.

supratherapeutic INR. This led to increased pain and bleeding into his leg soft tissue. Although this did not affect the stability of his knee, it was a deviation from the standard of care that, to a reasonable medical certainty, resulted in increased pain and caused the need for transfusion.

[ECF No. 179-4 ¶¶ 58–59]. Dr. Carrillo does not dispute that she was responsible for Plaintiff's post-operative care, see [ECF No. 169 at 13], and Dr. Hlubik's report demonstrates that there is at least a triable issue of fact as to whether Plaintiff's post knee replacement care was negligently provided and caused physical injury. In addition to the physical harm noted in Dr. Hlubik's report, Plaintiff attests that the resulting pain left him unable to sleep. Dr. Carrillo has not argued that Plaintiff's symptoms are insufficient to establish the elements of negligent infliction of emotional distress claim, but he does argue that the two claims merge because any emotional distress would also be compensable under Plaintiff's ordinary negligence claim. [ECF No. 169 at 14]. Although Dr. Carrillo's argument may be sound reasoning for how a jury should be instructed, it does not entitle him to a grant of summary judgment, and his motion will be denied with respect to Counts V and VI.

## V. CONCLUSION

Accordingly, Dr. Angeles and Dr. Carrillo's motions for summary judgment on Counts I, II, III are GRANTED. This resolves all claims against Dr. Angeles. Dr. Carrillo's motion for summary judgment on Counts V and VI is DENIED.

**SO ORDERED.**

January 4, 2019                                  /s/ Allison D. Burroughs
                                                 ALLISON D. BURROUGHS
                                                 U.S. DISTRICT JUDGE